We'll move now to Appeal 25-2380, United States v. Angelica Mendoza-Rubio. We'll begin with oral argument on behalf of the appellant, Mr. Ferrer. Thank you, Your Honors, and may it please the Court. My name is Grant Ferrer, and I am arguing on behalf of the appellant, Angelica Mendoza-Rubio. We are here today because the District Court erred with respect to two key legal issues. First, the District Court erred in applying a three-level manager-supervisor enhancement under U.S. Sentencing Guidelines Section 3B.1.1. And second, the District Court erred in determining that an incarceration period of 60 months was reasonable but no longer than necessary to comport with the goals of 18 U.S.C. 3553. We respectfully request this Court to vacate the judgment and to remand the case for further proceedings. Moving to my first point, this Court in United States v. Cologne stated that middleman status alone cannot support a finding that a defendant was a supervisor, manager, or leader of a criminal activity. And in the case before us, Mendoza-Rubio was exactly that. She was a middleman. What the government has provided to this Court is evidence that Mendoza-Rubio received pictures of photographs from Sinval of the large amounts of money that he recovered in his role as bulk cash carrier and that she would provide a Bitcoin wallet address to Carlos where he would send the money from Accounts A and Accounts B to the foreign beneficiaries overseas. Mendoza-Rubio was a bridge between the people on the ground who got the money and from the foreign beneficiaries who received the money. And the original PSR on paragraph 51 referred to Mendoza-Rubio as a go-between between the two sides of the criminal conspiracy because in this case that is exactly what Mendoza-Rubio was. She was a go-between, she was a middleman, and she was certainly not a supervisor or a manager of anyone in the criminal conspiracy. And that is further reflected in the Application Note Factor 4 of U.S. Sentencing Guidelines Section 3B1.1 which lists specific factors that the Court should consider in determining whether one is deemed a manager or supervisor. The Factor 4 does not say that all the factors need to be met, but in this particular case every single factor is met. Moving to the first factor in 3B1.1, the Claimed Right to a Larger Share of the Crime, the reason I mention this factor first is because it is also mentioned in the Background Note which states that those who are managers or supervisors tend to profit more from the offense. The revised PSR on paragraph 45 explicitly states that Sinval determined his commission to be 2.5%, determined Carlos' commission to be 2%, and determined Mendoza-Rubio's commission to be 0.25%. Thus the very person who Mendoza-Rubio was claimed to supervise in this particular case determined what everyone's commission was and determined that he would make 100 times more commission than she would. Now you know the government disagrees with your math on this commission point. Why do you and the government see that math differently? Yes, Your Honor. The government has the burden of proof to provide facts beyond a preponderance of the evidence that standards should have been applied in this particular case. The government has not provided evidence to dispute the fact that the commission figures were inaccurate and they did not present direct evidence to support the idea that Mendoza-Rubio did in fact make more money than Carlos or Sinval. What the government has provided is speculation based on the roles of Carlos and the roles of Sinval that they may have made more, but the government has not provided concrete evidence to show that Mendoza-Rubio did in fact make more than they did and they did not dispute the fact that Mendoza-Rubio made .25% commission. They did not present evidence that that fact was inaccurate and it was ultimately adopted by the revised PSR. Mr. Foray, you in your reply brief cite a case, Sainz-Preciado from 2009, in which the court found that the delegation of payment tasks was sufficient to be directing or coordinating and then satisfying for this requirement. Isn't Mendoza-Rubio directing the movement of the funds into the Bitcoin wallet? Isn't that the same thing as was found sufficient in Sainz-Preciado? No, Your Honor. It's not the same thing because in the differences between those two cases, in the government's brief in page 9, they specifically state that the foreign beneficiaries provided Mendoza-Rubio the Bitcoin wallet address. She was simply providing the Bitcoin wallet address to Carlos. So there's a step removed from where she didn't create the Bitcoin, Your Honor. She simply has the address and is giving it to the foreign beneficiaries. The best way to think of Mendoza-Rubio in this case is essentially like a waiter or a waitress in a restaurant who asked the customer what they want to eat and then they would go back to the kitchen, give the chef the order, and a food runner would then deliver the food to the person who asked the food. But no one would claim that a waiter or a waitress was managing or supervising the chef or managing or supervising anyone else in the restaurant. The waiter or the waitress is simply asking, okay, what do you want? And would deliver the instructions to the chef to deliver to the customer. Is Mendoza-Rubio the only co-conspirator who had the Bitcoin wallet address? Yes, Your Honor. It is true that Mendoza-Rubio was the only person who had the Bitcoin wallet address. But the test that is referred to in case law and the factors is, does Mendoza-Rubio manage or supervise other people? And the United States v. Cologne specifically states that the right focus is on the defendant's relative role within the criminal enterprise and the control they exercised over other participants in the operation. The question is not whether Mendoza-Rubio had advanced education that the government cites in their brief. It's not whether she was necessary or essential to the scheme. It's whether or not she emphasized control. Did she control other people? And the facts in the record are replete with constant facts that show that Sinval was the one who determined that her commission was 100 times less than his. Sinval recruited her to the criminal conspiracy. She didn't make the Bitcoin wallet address. The customers already provided that to her. Mendoza-Rubio was a bridge in this case. And that's exactly what the test is as demonstrated by the Seventh Circuit and U.S. Sentencing Guidelines 3B1.1. And in the time I have remaining under U.S. Sentencing Guidelines, excuse me, under 18 U.S.C. 3553, the District Court also erred in determining that an incarceration period of 60 months was appropriate given that Sinval received the same exact imprisonment sentence as Mendoza-Rubio. And Sinval once again determined his commission was 100 times higher, recruited Mendoza-Rubio to the conspiracy, and had a criminal record, which Mendoza-Rubio did not. Would you like to reserve the remainder of your time? Yes, Your Honor. Very good. Thank you, Mr. Foray. Thank you, Your Honor. We'll now move Ms. Dushman to you for oral argument on behalf of the appellee. Good morning. May it please the Court? My name is Meredith Dushman, and I represent the United States in this criminal appeal. The District Court clearly did not err, did not, excuse me, did not clearly err when it found that the defendant was a manager or supervisor in the charged money laundering conspiracy. The District Court also did not procedurally err at the sentencing because it adequately considered the sentencing factors, and the resulting sentence of five years was in the middle of the sentencing range the parties had agreed to, three to six and a half years, and it was not unreasonable. It was around half of the advisory sentencing guideline range of around 108 to 135 months. What are we to make of the argument of Sinval being a potentially more culpable actor, but receiving the same sentence? Well, I think with regard to the sentencing disparity issue, particularly as it relates to Sinval de Oliveira, I would start with the fact that I think from the judge's perspective, there was no one similarly situated to her. She was the most culpable in terms of sophistication. She was a certified accountant, and one of the things that the Court said— I don't see where the Court says that, though. I do see where the Court says, you're an accountant, shame on you. Yes. The Court accuses Ms. Mendoza-Rubio of using her business as cover. Yes. On what basis? Not clear from the record. But the Court doesn't say what you just said, which is you're more culpable than everybody else, and I don't see where the Court talks about anybody else. I'd like you to show me where the Court talks about anybody else. There is a space where the Court mentions the two words similarly situated, which is the opposite of what you just said, because the Court says I am taking into account similarly situated, and you just said the Court found her not similarly situated. So show me what you're looking at. Okay. Well, let me start with the key factual findings, I think, with regard to what her role is, and these issues obviously kind of overlap because relative role is really the whole point of the appeal. The district court found at page 8 through 9 of the transcript. Let me be more specific because we obviously have read the transcript. Yes. Where does he discuss her co-defendants in terms of disparities? We're on this disparity argument. I don't think he doesn't come right out and say, I have looked at the roles of Sinval compared to her, other than the statement that he says he was looking to avoid unwarranted sentencing disparities, but he's constantly talking about how she's an accountant and how key that is to him. In fact, he says he would have given her a lower sentence were it not for the fact that she had abused her role as an accountant. She's the only one in the case that's an accountant. He talks about her financial sophistication in the case. He talks about how she was really the key component in the whole case because she's the only person who knows who the money laundering client is. I think counsel used the analogy that she was a waiter, essentially. I would use a different real-life example, and that is that she's the general contractor of the fraud. The customer, the criminal client, needs money moved. That person wants to hide behind somebody else. The whole point is this is a concealment money laundering case, so that person needs to be able to move money in the United States while hiding in Mexico. They don't want their name associated with it. They need somebody to manage the money. They need somebody to manage the flow of the money. She is the general contractor. She's managing the subcontractors in the United States who are moving that money. That's her role in the case, and the court did find that she directed other people and that she managed the movement of the money. Going back, Your Honor, to your original disparity question, I do think that the fact that the court brought up, gosh, I want to say at least five times, the fact that she was an accountant and that he just found that so aggravating and would have given her a lower sentence were it not for that. That was what the court was focused on at the end of the sentencing. In fact, after all of the arguments and all of the exhibits and all of the arguments were presented about was she a manager or supervisor, ultimately the court erased that enhancement and gave her a sentence that was half, essentially, of her guideline range. Right in the middle of the range she agreed to, and the same as the individual that she was most closely associated with in the United States, which was the money pickup person. Do we know comparatively the other co-defendants? We know their sentences. Were their sentences also below guidelines? I can't remember if Sinval's was. Certainly the sentence of Carlos Neto was way below the guidelines. And that was Southern District of Florida? He was sentenced in Florida, correct. That was a different kettle of fish. And this was a binding plea, 11C1C? She agreed from three to six and a half, yes. And anybody else, any other defendants binding pleas? If you recall. I just don't recall if Sinval, I mean, it was my case, but I just don't recall if Sinval de Oliveira, we had a binding plea. And I apologize, I don't remember whether or not it was below guidelines. I think it must have been because they had the same loss amount, and it was sophisticated means and outside the United States, so many of the same, most of the same enhancements would have applied. I think they were 30 months in time served, right? Sinval got five years, de Oliveira. Oh, that's right. He got exactly the same sentence that he did. And Neto got eight months. Neto got eight months, correct, in Florida, yes. And your guess is that Sinval was also below guidelines? Yes, but to the extent that that matters, I absolutely can supplement the record on that, Your Honor. And what was Sinval's level of education? You said this was your case. Yes. Because I do see implicit in the transcript the focus on Mendoza Rubio being a CPA. Yes. And that she had the sophistication. He gave both her and Sinval the same sentence. Correct. So how did Sinval compare? You know, district courts have to do this weighing of culpability, right? Right. And clearly, I read in here, maybe this wouldn't have worked without Mendoza Rubio being the sort of brains behind the operation. Right. Well, I think you raise an excellent point, Your Honor. I think it's really important to really understand, as the court did, her relative role in the case in the sense of how critical an accountant who's willing to launder millions of dollars is to a money laundering operation. When a criminal needs money laundered, they hire somebody to do it in exchange for the fee. The criminal generating the proceeds is then her client. And then operating in Mexico, she uses a network of folks in the United States to physically carry out the laundering, which the court described as sophisticated. It had shell companies, nominee account holders, funnel accounts. It involved bulk money pickups and odd transactions, layered transactions. And I think one of the things that the court mentioned that is significant here is when you're comparing this sort of middleman concept. She's not a middleman in the money laundering operation. She is a middleman when you think about her role as the person who is the bridge between the criminal enterprise generating the proceeds and the money laundering conspiracy. But what was charged in this case was the money laundering conspiracy. She's at the top of that conspiracy. She's not a middleman in that regard. She was the person who was coordinating with Sinbol de Oliveira. The guy who's in the middle of the night standing there with thousands, hundreds of thousands of dollars going from ATM to ATM to ATM is not the head of the organization. Can you help me make sense of your footnote 5? In your brief where you explain to us the nature of any relationship between the unknown fraud perpetrators Cartier and Mendoza Rubio is unknown. Yes. So what we know, Your Honor, from the investigation is that we were able to successfully prosecute every single person that touched our money from after it left the victim's hands all the way until it got into the Bitcoin wallet of Mr. Cartier. The Southern District of New York prosecuted him for money laundering. But we don't know what happened to the money after that. Ms. Mendoza Rubio didn't really provide any information until sentencing. As noted in our brief, that was very, we think, self-serving. She never told us what the relationship was, and we don't know. Okay. I'm just trying to understand the relationship between what you don't know and the government's confidence that she was a manager given aspects of this org chart that the government is saying it does not know. So if you could just flesh that out for me. I know you're out of time, but you can finish that. Yes, Your Honor. So she admitted that the person that she was moving money for was the criminal trying to move the money. Now, what her specific relationship was with that person, she didn't share that for purposes of sentencing. She, as far as I'm concerned, only shared things that she thought would inert potentially to her benefit on the leader-organizer enhancement because, as you can see through the transcript, she was very focused on that because she thought that that would affect her for purposes of prison programming. That was a continual theme. But in terms of the nature of her relationship with that individual, the person who ultimately most of the fraud proceeds went to, we don't know other than that that was her money-laundering client. We do know, going back to the issue of the money, we know that she directed, of the fraud proceeds, $35,000 of that money to herself, to a bank account in Mexico that she controlled. So whether or not that person was their relationship in Mexico, we just don't know. Thank you, Ms. Duschman. That's all I can say. Thank you. Thank you. Mr. Foray, we'll move to you now for rebuttal argument. Thank you, Your Honors. The government, in their rebuttal, referred to the district court's emphasis on Mendoza-Rubio's expertise as an accountant and that the district court stated that they would have ruled lower had it not been for Mendoza-Rubio's experience as an accountant. That is further evidence that the district court clearly aired here because the test is not whether one is essential, the test is not whether one has advanced education or skills, the test is whether one manages or supervises other people in the criminal conspiracy. We recognize that Mendoza-Rubio is highly educated and that she does have skills as an accountant, but that just makes Mendoza-Rubio a highly educated waiter. But isn't that underestimating her connection to the alleged businessman in Mexico? She has a connection to this person. That's valuable, right? Your Honor, what that essentially, the significance of that point speaks to that Mendoza-Rubio had the ability to act as the bridge between the two sides, but the record was not provided by the government and the record does not flesh out the exact relationship that Mendoza-Rubio had with said individual and it shouldn't be the decision maker's goal to try to imagine what that relationship was when it's not fleshed out in the record. What we have before us here today is evidence of the commission figures. We have evidence that Mendoza-Rubio recruited no accomplices. We have evidence that Mendoza-Rubio received pictures from CINVOL and that she did provide the Bitcoin wallet address, but evidence that speaks to whether Mendoza-Rubio was familiar with other individuals not named in the record is not provided by the government and it's the government's burden to provide evidence that clear the preponderance standard to justify the enhancement and the government has not provided any such evidence and to look into it, in our view, is just speculation. Thank you, Mr. Foray. Thank you, Mr. Judge. Thank you, Ms. Dusherman. The case will be taken under advisement. This will complete the court's hearings for today.